UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COOK INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-01248-TWP-DKL |
| | ) | |
| ENDOLOGIX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY ON SUMMARY JUDGMENT ISSUE OF CONTRACTUAL ESTOPPEL

The present motion poses a difficult question: can a broadly-worded, albeit fairly generic, release that was part of a Settlement Agreement meant to end a lawsuit relating to non-compete agreements subsequently bar a much different second lawsuit that relates to patent infringement? Under the circumstances in this case, the Court finds that the answer is "No."

Plaintiff, Cook Incorporated ("Cook"), and Defendant Endologix, Inc. ("Endologix"), both make stent devices that treat abdominal aortic aneurysms ("AAA"). Cook's flagship stent is called the "Zenith" stent; Endologix's rival stent is called the "Powerlink" stent. Cook alleges that Endologix, through the sale of its Powerlink stent and accompanying delivery device (called the "Intuitrak"), is infringing two of its patents: (1) Patent No. 5,035,706 ("the '706 patent") and (2) Patent No. 5,755,777 ("the '777 patent").

The present lawsuit filed on October 6, 2009, is not the first lawsuit between these two companies. On this point, Endologix argues that the Court can dispense with the details about the patents and products because the present action is barred by "contractual estoppel." In other words, this lawsuit is precluded by a Settlement Agreement reached in a prior lawsuit (filed in this Court in 2008, just one year before the present one) between the same parties. At the motion

to dismiss stage, the Court rejected an ostensibly similar argument based on claim preclusion principles. (Dkt. #123.) Undeterred, Endologix has filed a similar Motion for Summary Judgment, this time focusing on the language in the 2008 Settlement Agreement. Although this motion presents an exceedingly close call (certainly a much closer call than the motion to dismiss), the Court ultimately reaches the same result: Endologix's motion (Dkt. #169) is **DENIED**.

## I. BACKGROUND

The parties in this action are competitors in the market for medical devices. Although competition fosters innovation, improves performance, reduces prices for consumers, and creates wealth, it also has a tendency to breed lawsuits among competitors. The instant patent infringement lawsuit was filed by Cook in October 2009. As mentioned, this is not the first litigation between the parties. The prior year, on February 6, 2008, Cook sued four of its former AAA district sales managers and Endologix in the Monroe Circuit Court, alleging that: (1) the former Cook employees breached their non-compete agreements, and (2) Endologix induced them to do so.[1]

In order to resolve the present motion, some background on that 2008 lawsuit is necessary. Prior to breaching their non-compete agreements, the former Cook employees sold Cook AAA products, primarily the Cook Zenith stent graft, to medical facilities and vascular surgeons. These employees cultivated close ties with those surgeons, sometimes staying in the operating room to watch the surgeon deploy the Zenith stent graft in AAA-related procedures. Further, these employees – who were privy to Cook's confidential and highly-sensitive customer Information, sales data, business plans, and technical product information– built up considerable

---

[1] This case was entitled *Cook Medical Incorporated and Cook Incorporated v. Andrea Griffin, Daniel Zubiria, Patrick Morrissey, Michael S. Wilkins, and Endologix, Inc.*, No. 53C01-0802-PL-00238.

institutional knowledge.

Cook alleged that Endologix recruited Cook's AAA district sales managers to switch teams and sell competitive Endologix devices, primarily the Powerlink System. But leaving Cook to join Endologix was not a seamless process. By doing so, the employees violated the terms of their non-compete agreement with Cook, which provided that for a period of 24 months following the employee's termination date, they were barred from selling or soliciting "any Competitive product . . . with any of [Cook's] . . . customers or prospective customers" with whom they had a prior business relationship with while employed by Cook. As Cook's complaint in the 2008 lawsuit noted, "the Employee Defendants are soliciting the sale of Endologix products (including the Powerlink stent graft) that compete with Cook products (including the Cook Zenith stent graft) to their former Cook customers, in violation of the customer restrictions on their Non-Compete Agreement." Accordingly, Cook sought damages and injunctive relief.

Roughly a week after Cook filed the 2008 lawsuit in state court, Endologix filed a Notice of Removal on the basis of diversity jurisdiction, transferring the case to the district court.[2] From there, the parties engaged in expedited discovery and briefed a preliminary injunction motion. On March 24 and 25, 2008, an evidentiary hearing was held. At the hearing, the parties devoted some attention to technical testimony about niche markets (i.e. whether or not the parties' stent products are fungible, given their unique characteristics and differences in human anatomy) and, in turn, to what extent the Cook Zenith stent graft and Powerlink systems are competitive products. In doing so, the parties' introduced physical samples of the Zenith and Powerlink devices and experts discussed the products' respective physical properties and operational

---

[2] This Court docketed the state court papers under No. 08-cv-0188-SEB-JMS.

differences. That said, the clear crux of the hearing related to the conduct of Endologix and the former Cook salespeople.

Ruling from the bench, Judge Barker granted Cook's motion for injunctive relief, finding that the former Cook employees breached their non-compete agreements, "aided and abetted" by Endologix. In making her ruling, Judge Barker described the relatively cavalier behavior of Endologix as "somewhat shocking, somewhat disturbing." The district judge also squarely rejected Endologix's defense relating to niche markets, describing it as "factually disingenuous" and "thrown together out of desperation."

Following the ruling and after briefing an appeal to the Seventh Circuit (but prior to oral arguments), Endologix and Cook settled, stipulating to a permanent injunction and a Final Judgment that the Court entered on December 1, 2008. Notably, in November 2008, Endologix received FDA approval for its Intuitrak delivery system, which it began selling in conjunction with the Powerlink. As part of the Settlement Agreement, Endologix paid Cook $600,000.00. In addition, the Final Judgment precluded the former Cook employees from soliciting Cook's customers, but allowed Endologix to continue servicing AAA customers accounts tied to those employees.

Important to the present dispute, as part of the Settlement Agreement, the parties also entered into a mutual release of all claims that either party "may have" that were "in any way related to any matters" that "were alleged" or "could have been alleged" in "the Lawsuit." The key portion of the Settlement Agreement reads as follows:

> **Plaintiff's Release.** Plaintiffs … hereby fully and forever release, acquit and discharge Defendants … from any and all actions, causes of action, claims, damages, obligations, promises, liabilities, costs, losses, and demands that <u>Plaintiffs have or may have on account of or arising out of or in any way related to any matters that were alleged in or that could have been alleged in the Lawsuit</u> (emphasis added)<u>.</u>

4

Further, the Settlement Agreement clarified that Endologix was not released from its obligations arising from the injunction order that was part of the lawsuit. However, Cook did not expressly carve out any other claims (such as patent infringement) from the release.

Unfortunately, the peace that the parties purchased through the Settlement Agreement was short-lived. On October 6, 2009, Cook initiated the present lawsuit, alleging that Endologix's Powerlink System infringes two if its patents: the '706 patent and the '777 patent. Near the beginning of this lawsuit, Endologix filed a Motion to Dismiss, contending that the doctrine of claim preclusion applied because the 2008 lawsuit precluded Cook's claims in the current patent infringement lawsuit. The Court denied that motion. (Dkt. #123.) But, in doing so, the Court specifically noted that it would be premature to consider the parties' arguments based on the Settlement Agreement. (Dkt. #123 at 7 n.4.) So, after the Court denied that motion (and held a *Markman* hearing and issued a related claim construction order), Endologix filed the present Motion for Summary Judgment. (Dkt. #169.) Additional facts are added below as needed.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest

on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted). Notably, "[c]ontract interpretation is a subject particularly suited to disposition by summary judgment. . . . If a contract is unambiguous, by definition no material issues of fact exist regarding the contract's interpretation; that interpretation is a question of law for the court." *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988).

### III. DISCUSSION

The crux of Endologix's argument is that the release contained in the 2008 Settlement Agreement is clear, unambiguous, and bars the present lawsuit. The Settlement Agreement provides that it shall be construed in accordance with Indiana law. Under Indiana law, "[a] release . . . should be interpreted according to the standard rules of contract law[.]" *Huffman v. Monroe County Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992). In contract cases, the court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties. *Trustcorp Mortg. Co. v. Metro Mortg. Co., Inc.,* 867 N.E.2d 203, 212–13 (Ind. Ct. App. 2007). The court must read the contract as a whole, construing language to give meaning to all

of the contract's words, terms, and phrases. *Id.* at 213. Likewise, the court must accept a contract interpretation that harmonizes provisions, not one that places provisions in conflict. *Id.* Here, the parties dispute the meaning of various provisions of the Settlement Agreement, but disagreements about the meaning of words and phrases in contracts is hardly unusual. The law is well-settled that differing, self-interested interpretations do not create ambiguity. *See Ind. Dept. of Transp. v. Shelly & Sands, Inc.,* 756 N.E.2d 1063, 1069 (Ind. Ct. App. 2001). Instead, a contract is ambiguous only when it is "susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Id.* at 1069-70. And, absent ambiguity, the court must give the contract terms a plain and ordinary meaning. *Id.* at 1070.

Endologix's argument can be summarized as follows. Through the Settlement Agreement, Cook released Endologix from "actions, causes of action, claims, [and] damages" that it "may have" that were "in any way related to any matters that were alleged in or that could have been alleged" in the 2008 "Lawsuit." According to Endologix, Cook could have easily brought the present patent infringement action back in 2008 as part of the prior lawsuit. In Endologix's view, the two lawsuits cover similar terrain, evidenced by the fact that Cook currently seeks damages for the sales of the same product to the same customers that were arguably at issue in the 2008 lawsuit. Accordingly, the argument goes, "Cook's patent infringement claims were released under the terms of the Settlement Agreement." (Dkt. #166 at 18.) In that same vein, if Cook wanted to reserve a claim for patent infringement, it could have, and should have, expressly done so, and its failure to do so is fatal to the present lawsuit. After all, Cook unquestionably knew about the Powerlink when it settled the 2008 lawsuit.

To be sure, Cook played with fire by signing a broadly-worded release at the conclusion of the 2008 lawsuit. But, in the end, the Court finds that Cook is not contractually barred from

bringing the present patent infringement lawsuit. Before delving into the reasons for this ruling, another review of the operative language is warranted:

> **Plaintiff's Release.** Plaintiffs … hereby fully and forever release, acquit and discharge Defendants … from any and all actions, causes of action, claims, damages, obligations, promises, liabilities, costs, losses, and demands that <u>Plaintiffs have or may have on account of or arising out of or in any way related to any matters that were alleged in or that could have been alleged in the Lawsuit</u> (emphasis added).

Reviewing the language closely and considering the plain and ordinary meaning of terms, the Court finds that Endologix's motion fails for two related reasons.

First, the present patent infringement lawsuit is not "<u>in any way related to</u>" the 2008 Lawsuit; nor does it "<u>aris[e] out of</u>" that lawsuit. At its core, the 2008 lawsuit focused on a group of former Cook employees gone rogue, leveraging their institutional knowledge, deep familiarity with products, and tight-knit relationships to work for a competitor in the marketplace for AAA products. The key evidence related to the behavior of these employees, the behavior of Endologix, and the obligations imposed by the non-compete agreement. The fact that AAA products were involved was, at the absolute most, incidental and ancillary to the important issues at play. The present lawsuit, by contrast, is single-mindedly focused on a nuts-and-bolts review of the structure, operation, and features of the accused products.

Plainly stated, the 2008 lawsuit was about *people*, whereas the present lawsuit is about *products*. This fact distinguishes the present case from some of the key cases relied on by Endologix. *See Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999) (claims in first lawsuit – unfair competition, false advertising, deceptive trade practices, and product disparagement – involved the production and marketing practices for the same product alleged to infringe in the second suit); *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 785 (8th Cir. 1984) (claims in first lawsuit involved misuse of trade secrets

and confidential information relating to the installation of a press conversion system, which was the very subject matter of the patents asserted in the second suit).

As for Endologix's reliance on *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384 (7th Cir. 2008), that case is also distinguishable. In that case, Conseco, an insured, was sued twice: first for securities fraud, and then under ERISA. *Id*. at 386-87. During the first lawsuit, a dispute arose between Conseco and its insurers, including RLI, regarding the coverage of litigation costs. *Id*. at 386. Ultimately, RLI and Conseco settled that case with a full release for any subsequent claims that were "in any way related to . . . the Securities action." *Id*. at 387. Around that time, Conseco got hit with a similar ERISA lawsuit alleging false SEC filings, mismanagement of plan assets, failure to make certain disclosures, and divided loyalties. *Id*. at 387-88. The Seventh Circuit found that RLI had no duty to defend in the second lawsuit because it was sufficiently "related to" the first lawsuit. *Id*. at 391. Notably, the Seventh Circuit found that both lawsuits were based on "*the same false reporting and manipulation*[.]" *Id*. (emphasis added). Here, it goes without saying that the relationship between the two lawsuits is by far, less similar; as a practical matter, there is neither a "causal" nor a "logical" connection between the two suits. *See id*.

Moreover, under similar circumstances, courts have exercised common sense by finding that releases signed to settle non-product related lawsuits did not bar subsequent patent infringement actions. *See Lucent Techs., Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1195, 1201-02 (S.D. Cal. 2007) (holding that a general release drafted to cover a billing dispute did not release patent infringement claims because the two disputes could not be said "to have arisen from the same or even a related incident between the two companies"). Further, in an unpublished opinion, the Federal Circuit has previously emphasized that similarly-worded releases should not

9

bar subsequent, unrelated lawsuits, even if both cases deal with similar intellectual property. *See Diversified Dynamics Corporation v. Wagner Spray Tech Corporation*, 106 Fed. Appx. 29 (Fed. Cir. 2004) (unpublished).[3]  In *Diversified*, the patent owner filed a first lawsuit asserting a patent infringement of the '176 patent. *Id*. at 30.  The parties settled and released "any and all actions … arising out of or in any way related to the '176 patent." *Id*.  The patent owner then filed suit on its '123 patent, which was related in several ways to the '176 patent. *Id*. at 30-31.  The district court granted summary judgment on the second lawsuit on the basis of the prior release. *Id*. at 30.  The Federal Circuit reversed, holding that the second suit was not barred because "[t]he phrases 'arising out of' and 'in any way related to' refer back to the '176 patent and require a relationship between the action and the patent itself." *Id*. at 32.  That reasoning applies with considerable force here.  In order to bar this action, the present infringement claims must relate to the 2008 lawsuit, which pertained to whether employees breached (and were induced to breach) their non-compete contracts.  In short, the two lawsuits are not meaningfully related.

Second, the Court finds that, as a practical matter, the patent infringement allegations could not have been alleged in the 2008 lawsuit, which was initially brought in Monroe Circuit Court in the State of Indiana and was for breach of non-competition agreements and tortious interference.  It is undisputed that that patent infringement claims were not actually alleged in the 2008 lawsuit.  Nor *could they have been brought* in that lawsuit (at least initially), given that federal courts have exclusive jurisdiction over patent disputes.  *See* 28 U.S.C. § 1338(a).

---

[3] It is true, as Endologix emphasizes, that the *Diversified* unpublished opinion may not be relied on as precedent, and, *arguably*, Federal Circuit Rules do not permit reliance on non-precedential cases prior to 2007. Fed. Cir. 32.1(c) ("Parties are not prohibited or restricted from citing nonprecedential dispositions issued after January 1, 2007.").  Although the Court does not view *Diversified* as binding from a precedential standpoint, it does consider its reasoning to be helpful and instructive.  The Court believes that considering *Diversified* for this limited purpose is appropriate.  *See*. Fed. Cir. R. 32.1(d) ("The court may . . . look to a nonprecedential disposition for guidance or persuasive reasoning . . . .").

10

It is true, as Endologix emphasizes, that the lawsuit was removed to federal court based on diversity jurisdiction. However, in the Court's view, this fact is not a game-changer. As Cook notes, "Endologix has not identified any authority that states or suggests that Cook had an obligation to amend its complaint following removal." (Dkt. #173 at 28). To the contrary, well-reasoned case law suggests that Cook had no such obligation. On this point, the Eleventh Circuit's decision in *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 84 F.3d 1388 (11th Cir. 1996) is particularly instructive. In *Aquatherm*, plaintiff initially filed a complaint in state court based on state antitrust claims; later the case was removed to federal court and ultimately dismissed. *Id*. at 1390. Prior to dismissal, plaintiff filed an action in federal court alleging federal antitrust claims, and this second action was dismissed by the district court on claim preclusion grounds. *Id*. at 1391. The Eleventh Circuit reversed the dismissal, holding that "there is no authority for the district court's proposition that Aquatherm was required to assert its federal claims when it found itself in federal court by virtue of removal." *Id*. at 1393. Although this summary judgment does not turn on claim preclusion arguments, that same basic reasoning applies with some force here.

To this, Endologix has a strong response: just because Cook *wasn't obligated* to add a patent infringement action, it still *could have* added this cause of action, and the latter is all that matters for purposes of the release language. However, this argument is contrary to the way numerous courts have interpreted the "could have been alleged" language. In *Bank One, Nat'l Ass'n v. Surber*, 899 N.E.2d 693 (Ind. Ct. App. 2009), for instance, the Indiana Court of Appeals held that releasing claims asserted "or which could have been asserted" in the lawsuit demonstrated the parties' "intent to limit the release to the pending litigation" settled by the release. *Id*. at 703. Along similar lines, in *In re Managed Care Litigation*, the Eleventh Circuit

11

narrowly construed "could have been asserted" language. 605 F.3d 1146 (11th Cir. 2010). There, the release pertained to claims "that are, were or could have been asserted against any of the Released Parties based on or arising from the factual allegations of the Complaint . . . ." *Id.* at 1148. Reversing the district court's ruling that the later suit was barred by the release, the Eleventh Circuit held that the release did "not release claims that could have been asserted based on or arising out of factual allegations that could have been added *by amendment to* [the prior lawsuit]." *Id.* at 1151-52 (emphasis added). Rather, "[t]he release language is clear; it concerns only claims that could have been asserted 'based on or arising from the factual allegations of the [first lawsuit's] Complaint.'" *Id.* at 1152.

Although the release language at issue is not identical to the language found in *In re Managed Care*, that case's reasoning applies with considerable force here. The "Lawsuit" described in the Settlement Agreement is not a hypothetical lawsuit based on claims that Cook could have added if it chose to amend its complaint (during the course of fast-paced litigation that focused almost entirely on whether non-compete agreements were breached). In the end, the Court agrees with Cook that the "could have been alleged" language "merely reflects the unremarkable proposition that Cook released claims that, although supported by the factual allegations of the 2008 Complaint, were nonetheless not pursued" and "[p]atent infringement is not such a claim." (Dkt. #173 at 29.)

As a practical matter, this interpretation is the only way to harmonize the release in the Settlement Agreement with common sense. Indeed, contract interpretation is meant to divine and effectuate the parties' intent at the time the contract was made; through this process, the Court need not check common sense at the door. *See Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) ("Common sense is as much a part of contract interpretation as

is the dictionary or the arsenal of canons."). Otherwise, the Court reaches a truly odd and inequitable result where a patent infringement action is barred because of a broadly-worded but superficial release designed to settle an earlier case that had absolutely nothing to do with patents and little, if anything, to do with actual products. As Cook alleges, "[t]he record does not support or permit a reasonable inference that, for a fraction of Cook's damages claim in the 2008 lawsuit, Endologix not only 'purchased its peace' to get out from under a preliminary injunction ... but that it also purchased the right to infringe Cook's patents to the tune of upwards of $100 million in sales." (Dkt. #173 at 7.) For these reasons, Endologix's motion must be denied.

Before concluding, the Court pauses to address and clarify one additional point. Both parties reiterate that the release did not expressly mention patent claims. In Cook's view, this fact shows that the language of the Settlement Agreement was "exclusively directed towards the contract and tortious interference issues disputed in that 2008 lawsuit." (Dkt. #173 at 25.) To bolster this claim, Cook relies on *Baseload Energy, Inc. v. Roberts,* 619 F.3d 1357, 1363 (Fed. Cir. 2010) (reversing district court's decision granting summary judgment on release issue and observing that there was "no specific language in the settlement agreement making reference to invalidity issues" and "there was no issue in the [first lawsuit involving breach of contract] . . . concerning patent infringement or patent invalidity and unenforceability and no prior dispute between the parties as to such issues"). Endologix persuasively turns this argument on its head, emphasizing that if Cook wanted to reserve or carve out patent infringement claims, it could have expressly done so, and its failure to do so is fatal. Endologix relies on *Augustine Medical*, cited above, to support this proposition. In *Augustine Medical*, the Federal Circuit noted that "[b]ecause [Plaintiff] had clear knowledge of [Defendant's] manufacture and sale of [the product at issue] at the time of the Settlement Agreement, it had a claim for alleged patent infringement

against [Defendant] at that time and *should have expressly reserved the claim*." 194 F.3d at 1373 (emphasis added).

In the end, both of these arguments are well-taken, but neither tips the scales decisively in either party's favor. To some degree, these arguments are "a wash." Moreover, *Augustine Medical*, while extremely helpful to Endologix's argument, is distinguishable for three reasons. First, as mentioned above, in *Augustine Medical*, the first lawsuit – the one resulting in a settlement agreement – related to the actual product at issue. In that case, the Federal Circuit repeatedly emphasized that the product that was subject to the patent infringement lawsuit was the same product at issue in first lawsuit relating to unfair competition. *Id*. at 1369, 1373. Here, by contrast, the first lawsuit related to people: specifically, the actions of salesman and whether they breached (and were induced to breach) their non-compete agreements.

The second distinguishing feature of *Augustine Medical* is less straightforward, but still worth noting. Specifically, in *Augustine Medical*, the plaintiff in the subsequent patent infringement suit arguably "knew that it had an infringement claim against [defendant] at the time of the release[.]" *Diversified Dynamics Corp.*, 106 Fed. Appx. at 33 (distinguishing and refusing to apply *Augustine Medical* because, in that case, the patentee had *known* it had a patent infringement claim at the time it signed the release). Here, there is no evidence suggesting that Cook knew it had an infringement action against Endologix at the time it signed the Settlement Agreement.[4]

Third, in *Augustine Medical*, the patentee had *tried* to carve out future patent claims from the release. 194 F.3d at 1369. However, when the defendant refused to agree to the carve-out,

---

[4] Admittedly, as Endologix emphasizes, it is somewhat unclear if the plaintiff in *Augustine Medical* subjectively knew that it had a viable patent infringement action at the time of the release, or if it merely knew that the defendant manufactured and sold the infringing products at the time of the release. Implicitly, *Diversified Dynamics Corp.* suggests that it was the former. In the Court's view, this result is by far the most sensible.

14


the patentee nonetheless executed the settlement and release. *Id*. By contrast, the parties herein never entertained the possibility that the release in the Settlement Agreement had anything to do with patents.

## IV. CONCLUSION

For the reasons set forth above, Endologix's Motion for Summary Judgment (Dkt. #169) is **DENIED**. The Court will address Endologix's remaining Motion for Summary Judgment (Dkt. #179) in due course.

SO ORDERED.   07/06/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Daniel K. Burke
HOOVER HULL LLP
dburke@hooverhull.com,
fgipson@hooverhull.com

Joseph S. Cianfrani
KNOBBE MARTENS OLSON & BEAR, LLP
joseph.cianfrani@kmob.com

Kelly J. Eberspecher
BRINKS HOFER GILSON & LIONE
keberspecher@brinkshofer.com

John David Evered
KNOBBE MARTENS OLSON & BEAR, LLP.
2jde@kmob.com,
jennifer.ratwani@kmob.com

Ralph J. Gabric
BRINKS HOFER GILSON & LIONE
rgabric@brinkshofer.com,
cbeam@brinkshofer.com

Andrew W. Hull
HOOVER HULL LLP
awhull@hooverhull.com,
fgipson@hooverhull.com

Bradley G. Lane
BRINKS HOFER GILSON & LIONE
blane@brinkshofer.com,
federalcourts@brinkshofer.com

Bryan John Leitenberger
BRINKS HOFER GILSON & LIONE
bleitenberger@brinkshofer.com

Danielle Anne Phillip
BRINKS HOFER GILSON & LIONE
dphillip@brinkshofer.com,
danielle.a.phillip@gmail.com

Jason W. Schigelone
BRINKS HOFER GILSON & LIONE
jschigelone@brinkshofer.com

John B. Sganga, Jr
KNOBBE MARTENS OLSON & BEAR, LLP.
2jbs@kmob.com

Joshua J. Stowell
KNOBBE MARTENS OLSON & BEAR, LLP.
2jys@kmob.com