UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COOK INCORPORATED Corporate Parent COOK GROUP INCORPORATED, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| ENDOLOGIX, INC., | ) ) |
| Defendant. | ) ) ) No. 1:09-cv-01248-TWP-DKL |
| _____ | ) ) |
| ENDOLOGIX, INC., | ) ) |
| Counter Claimant, | ) ) |
| vs. | ) ) |
| COOK INCORPORATED, | ) ) |
| Counter Defendants. | ) ) ) |

**ENTRY ON ENDOLOGIX'S MOTION TO EXCLUDE OPINION TESTIMONY OF COOK'S DAMAGES EXPERT JULIE DAVIS**

This matter is before the Court on Defendant Endologix Inc.'s (Endologix) Motion to Exclude Opinion Testimony of Cook's Damages Expert Julie Davis (Dkt. 193). Plaintiff Cook Inc., ("Cook") retained Ms. Davis as a damages expert and on December 16, 2011 Ms. Davis submitted her expert report pursuant to Federal Rule of Civil Procedure 26(2)(B). Endologix objects to Ms. Davis's opinion testimony alleging it is unreliable and used improper analyses. For the reasons set forth below, Endologix's motion is **DENIED**.

1

## I. BACKGROUND

The facts and background of this case are set forth at length in the Court's Entry on Claim Construction (Dkt. 145) and Entry on Endologix's Motion for Summary Judgment of Noninfringement (Dkt. 300). The Court will provide only the facts relevant to the current motion.

Cook retained Ms. Davis as a damages expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and she subsequently submitted her expert report. The expert report establishes Ms. Davis's background in auditing and financial consulting services to attorneys and corporate clients, the scope of her retention by Cook, information relied upon, and an analysis and calculation of lost profits and reasonable royalties due to Cook.

Ms. Davis's calculations necessarily assume infringement liability and that "but for Endologix offering the accused products for sale, Cook would have been able to capture a portion of those sales." Dkt. 196-1 at 13. For those sales not subject to lost profits damages, Ms. Davis "calculated damages based on a reasonable royalty applied to the net sales of Endologix's infringing sales." Dkt. 196-1 at 13. Ms. Davis calculated damages of $10,615,804 in lost profits relating to infringement of the '706 patent and $11,735,293 in reasonable royalties relating to infringement of both the '706 patent and '777 patent, for total damages of $22,351,097. However, if the only appropriate measure of damages is reasonable royalties, Ms. Davis calculated a total award of $14,819,716 relating to infringement of both patents-in-suit.

Endologix has moved to exclude Ms. Davis's testimony. Endologix contends Ms. Davis's calculation of lost profits "rests entirely upon her speculative and unreliable assumption that Cook would have captured Endologix's infringing sales in direct proportion to Cook's market share." Dkt. 194 at 2. Specifically, Endologix argues Ms. Davis improperly considered

all Abdominal Aortic Aneurysm ("AAA") devices to be fungible and applied an arbitrary pro rata market share approach. Regarding reasonable royalties, Endologix contends Ms. Davis improperly relied upon an unrelated court ruling, *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, No. CV-03-597-PHX-MHM, 2010 U.S. Dist. Lexis 144259 (D. Ariz. Sept. 9, 2010), as a relevant bench mark to justify an inflated royalty rate.

## II. LEGAL STANDARD

"Under the *Daubert* gatekeeping requirement, the district court has a duty to ensure that expert testimony offered under Federal Rule of Evidence 702 is both relevant and reliable." *Jenkins v. Bartlett*, 487 F.3d 482, 488–89 (7th Cir. 2007). "Whether proposed expert testimony is sufficiently reliable under Rule 702 is dependent upon the facts and circumstances of the particular case." *Id.* The Court is given latitude to determine "not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). "The court should [ ] consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion." *Id.*

## III. DISCUSSION

The patent statute requires that upon proof of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "The phrase 'damages adequate to compensate' means full compensation for any damages the patent owner suffered as a result of the infringement. Full compensation includes any foreseeable lost profits the patent owner can prove." *Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir.

1999) (internal quotation marks and citation omitted). Therefore, in some cases, a patent owner may be entitled to both lost profits and reasonable royalty damages.

**A. Lost Profits**

"To recover lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits." *Id.* Once the showing is made by a reasonable probability, the burden shifts to the accused infringer to establish the patent's owner "but for" causation claim is unreasonable. *Id.* A patent owner can meet its burden by establishing the *Panduit* factors: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). This requires a reconstruction of the market, "as it would have developed absent the infringing product." *Grain Processing Corp.*, 185 F.3d at 1350. Reconstructing the market is by definition a hypothetical enterprise. *Id.* "To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.*

**1. Ms. Davis's Expert Opinion Regarding Lost Profits**

Assuming a finding of infringement, Ms. Davis calculated the additional sales of the Zenith stent grafts and delivery systems Cook would have made "but for" Endologix's infringement by applying the four factors set forth in *Panduit Corp. v Stahlin Bro. Fibre Works, Inc.*, 575 F. 2d 1152, 1156 (6th Cir. 1978). First, she described evidence that shows demand in the market for a product incorporating the patented invention, or the '706 patent. This includes the number and growth of procedures using endovascular repair for treating AAA, increased

AAA diagnoses, and historical sales and revenue of Endologix's AAA and Cook's Zenith products. Second, Ms. Davis noted there are two companies, Medtronic and Gore, which compete with Cook's Zenith products for the treatment of AAA. Therefore, she applied *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1577–80 (Fed. Cir. 1989), which stands for the proposition that a patent owner would have captured the sales of an accused product in proportion to the patent owner's market share. Third, Ms. Davis determined that Cook had the manufacturing and marketing capacity to exploit demand. Fourth, Ms. Davis calculated the lost profits by determining the number of lost sales, which she determined to be 2471 units, and the corresponding lost revenue. Then, she determined lost profits by subtracting the cost of manufacturing the units and royalties paid. Ms. Davis opined that the lost profits totaled $10,615,804. In this section of her report, Ms. Davis noted testimony that the Powerlink and Cook's Zenith products were "virtually identical" and "there would be no anatomies which would be serviced exclusively by Cook or Endologix devices." Dkt. 196-1 at 22.

**2. Endologix's Motion to Exclude Ms. Davis's Lost Profits Analysis**

Endologix contends Ms. Davis failed to reliably reconstruct the market absent the accused infringing products. Specifically, Endologix argues Ms. Davis ignored market realities and used an underlying market share calculation based upon speculation.

First, Endologix argues Ms. Davis mistakenly assumed that Cook, Medtronic, Gore, and Endologix compete identically for all sales of AAA stent grafts. That is, she treats all AAA stent grafts as fungible, when Endologix argues, she should have assessed "how the suitability of the competing AAA devices for different AAA or patient characteristics would have governed the distribution of Endologix's allegedly infringing unit sales among its competitors in the 'but for' world of calculating lost profits." Dkt. 194 at 13. Endologix relies upon *BIC Leisure Prods.,*

5

*Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214 (Fed. Cir. 1993) and *King Instruments Corp. v. Perego*, 65 F.3d 941 (Fed. Cir. 1995).

In *BIC*, Windsurfing sued BIC for infringement of a sailboard patent. After finding infringement, the district court awarded Windsurfing lost profits based on its pro rata share of the market. The Federal Circuit reversed and found the record in the case did not "evince a reasonable probability that Windsurfing would have made its pro rata share of BIC's sales had BIC not been in the market." *BIC*, 1 F.3d at 1218. The court reasoned that the sailboard market was relatively elastic and was particularly sensitive to price disparity. *Id.* For example, the BIC sailboard sold for $350 while the Windsurfing board sold for around $600. Other competitors in the market sold boards resembling BIC's at a similar price. Therefore, the court held the district court erred in assuming BIC's customers "would have redistributed their purchases among all the remaining sailboards, including Windsurfing's One Design boards at a price $200 to $300 more than BIC's." *Id.* Thus, Windsurfing and BIC were not competing in the same market and there was no "but for" causation of lost profits. *Id.* at 1219.

In *King Instruments*, Perego was found to infringe upon one of King Instrument's patents regarding a magnetic tape loader. The district court awarded King Instruments lost profits based on market share. *King Instruments*, 65 F.3d at 953. The Federal Circuit affirmed the district court's award and found no error in the analysis. *Id.* To reach its conclusion, the district court first determined that King Instruments controlled 70% of the market. However, the district court took into account differences between the patented device and the infringing device to lower the amount of total sales King Instruments likely would have lost. *Id.* Specifically, the district court noted that the infringing machine was a "double pancake model" whereas King Instruments sold a "single pancake loader." *King Instruments Corp. v. Perego*, 737 F. Supp. 1227, 1242 (D.

6

Mass. 1994). Therefore, it was possible that some buyers were only in the market for a double loader and would not have purchased a single loader had the infringing product been unavailable. *Id.* The district court accordingly adjusted the total lost profits. *Id.*

Endologix relies upon these cases to argue that like the markets in *BIC* and *King Instruments*, the AAA stent graft market conditions belie application of the simple market approach taken by Ms. Davis. Specifically, Endologix argues the following: "[t]he suitability of the device for a particular patient and the patient's anatomy is material to the physician's choice of a[n] AAA stent for that patient"; "[c]ertain anatomical features or characteristics rendered a patient less suitable for treatment with Cook's Zenith device"; "[s]ome anatomies are unsuitable for a suprarenal device such as Cook's Zenith because of adverse conditions in the suprarenal aorta"; "Cook was not able to treat patients with certain anatomies . . . until late 2006 when it launched its 36mm graft"; "[t]he 2004 Instructions for Use for the Cook Zenith and accused Endologix Powerlink devices contained different indications relating to patient anatomies"; and "Cook's Zenith was unable to treat certain patients with smaller access vessels that the Powerlink could treat because of its smaller size." Dkt. 194 at 7–8. Endologix argues that because Ms. Davis did not make any attempt include the role played by patient anatomy in the choice of AAA stent grafts during the damages period, her methodology is unreliable.

Endologix also contends Ms. Davis's use of the Millennium Research Group ("MRG") and BIBA Medical Ltd. ("BIBA") market reports was flawed. First, Endologix argues that the reports have divergent market share data that Ms. Davis fails to explain. Second, it contests Ms. Davis's solution to missing data in each report. In response to Ms. Davis's method of averaging data from 2007 and 2009 to fill in the gap of 2008, Endologix argues, "Ms. Davis's approach seems to have been mere mathematical convenience rather than reliable methodology as Ms.

7

Davis relies on no other data to support her guesswork on 2008." Dkt. 194 at 15. Further, in response to Ms. Davis's method of extrapolating a year of market share data from a single quarter of data, Endologix argues that Ms. Davis adds another layer of speculation and unreliability to the analysis. Finally, Endologix argues that averaging each final market share derived from the MRG and BIBA reports to yield an ultimate result adds "yet another flawed layer to the whole house of cards." Dkt. 194 at 15. Therefore, Endologix concludes Ms. Davis's testimony is unreliable.

Cook responds that Ms. Davis reliably reconstructed the "but for" market through the evidentiary record, interviews with witnesses and technical experts, and reliable market share data. Cook points out it is undisputed that there are four competitors in the AAA market: Cook, Endologix, Medtronic, and Gore. It cites evidence that Cook's and Endologix's products compete for the same sales, and that there are no patient "anatomies that would be serviced exclusively by Cook or Endologix products." Dkt. 207 at 15. Therefore, there is competing evidence in the record regarding whether individual AAA patients could be treated with any AAA stent graft available in the market. Cook argues that under Endologix's approach, Ms. Davis would have been forced to use speculation, but instead she "accounted for the possibility of such variables in the AAA market by allocating market share to Cook and its competitors." Dkt. 207 at 17.

Cook also responds that Ms. Davis used "precisely the kind of reliable market share data that experts usually rely on in this type of analysis, and she used generally accepted principles in accounting for the missing data." Dkt. 207 at 17. Cook argues that Endologix's objections go to the weight of Ms. Davis's testimony, not the reliability. Cook notes that the BIBA and MRG market reports Ms. Davis used "provide comprehensive overviews of the domestic AAA market,

including participants in the market, their share of the market, as well as trends in and drivers of the market," and evidence from both parties has identified the reports as reliable information. Dkt. 207 at 14–15. Cook also cites to a statistics book to support Ms. Davis's method of averaging data to fill in missing years or quarters.

Finally, Cook distinguishes Endologix's cases. Specifically, it states that *BIC* is irrelevant because there, lost profits could not be shown "where there was *uncontradicted evidence* that the patentee and the accused infringer sold different quality products at different prices to different customers through different marketing channels." Dkt. 207 at 21. The case is distinguishable because, Cook argues, Cook and Endologix are direct competitors in the AAA market: "The evidence shows their products are substantially similar, have substantially similar prices, and are sold to the same customers." Dkt. 207 at 21.

### 3. Determination of Admissibility

The Court finds that Ms. Davis's methodology and report are reliable. First, the Court agrees with Cook that Endologix's cases are inapposite. The differences in products contemplated in *BIC* and *King Instruments* were greater in degree than in the current case. For example, in *BIC*, the difference in price between the products essentially meant the two parties were not competitors for the same sales. Here, the differences between the Powerlink and Cook's products do not rise to this extreme. Endologix and Cook still directly compete for sales. Furthermore, the Court agrees with Cook that there is competing evidence as to whether Cook's and Endologix's products are distinct or fairly interchangeable. To the extent Endologix believes Ms. Davis's opinion did not adequately consider the different variables of the products, Endologix may present its own damages theory at trial. It is ultimately "up to the jury [ ] to

weigh the credibility of the parties' opposing theories and evidence." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378 (Fed. Cir. 2003).

Second, the Court also agrees with Cook that Ms. Davis's calculation of market share is based on reliable data and methods. Endologix does not provide any alternative data that would have been more reliable upon which Ms. Davis could have relied. Moreover, it does not suggest how the data for the missing year or quarters could otherwise have been calculated. Although it is Cook's burden to establish the admissibility of its expert's report, Endologix's bare allegation of unreliability is easily overcome. The Court is persuaded by Cook's response and citation to evidence supporting Ms. Davis's methods and source material. Therefore, Endologix's motion to exclude Ms. Davis's opinion regarding her lost profits analysis is denied.

**B.  Reasonable Royalties**

"A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010). A reasonable royalty analysis requires hypothesis, but to avoid lapsing into pure speculation, "the damages inquiry must concentrate on compensation for the economic harm caused by the infringement of the claimed invention." *Id.* Furthermore, proof of damages must be tied to the "claimed invention's footprint in the market place." *Id.* To determine a reasonably royalty, courts apply an "unprioritized and often overlapping," *id.*, list of fifteen relevant factors found in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Parties and courts should take care to avoid relying on license agreements "radically different from the hypothetical agreement under consideration." *ResQNet.com*, 594 F.3d at 869.

10

### 1. Ms. Davis's Expert Opinion Regarding Reasonable Royalties

Ms. Davis opined that "lost profits would not be an appropriate measure of damages for all sales of the accused products." Dkt. 196-1 at 24. Therefore, she applied a reasonable royalty analysis, relying upon the factors identified in *Georgia-Pacific*. Ms. Davis opined that separate negotiations would have taken place for the '706 and '777 patents, and would have resulted in separate royalties for each. Relevant to the current motion, Ms. Davis considered several factors that would have been particularly important to the hypothetical negotiators, including: agreements for the patents-in-suit, agreements for other comparable technology, relative importance of the patented technology to Endologix, relationship between Cook and Endologix, delay associated with developing a non-infringing alternative, other relevant benchmarks, and profitability of the relevant products.

Specifically, under "other relevant benchmarks," Ms. Davis considered a ruling in *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, No. CV-03-597-PHX-MHM, 2010 U.S. Dist. Lexis 144259 (D. Ariz. Sept. 9, 2010). In *Bard*, the technology at issue was prosthetic vascular structures, including surgical graft products and stent graft products. The district court there ordered a compulsory license of 20% for the products where the parties were direct competitors and 15% where they were not directly competing. *See Bard*, 2010 U.S. Dist. Lexis 144259 at *27. In light of the opinion, she noted Endologix and Cook are direct competitors.

After addressing the relevant *Georgia-Pacific* factors, Ms. Davis opined that the appropriate royalty rate for the '706 patent is 10% of net sales, in light of several factors including the decision in *Bard*. She further opined the appropriate royalty rate for the '777 patent is 5%.

### 2. Endologix's Motion to Exclude Ms. Davis's Reasonable Royalty Analysis

Endologix contends that Ms. Davis improperly relied on the *Bard* decision when calculating a reasonable royalty, because "it is inappropriate to consider unrelated court rulings in calculating reasonable royalty rates." Dkt. 194 at 17. Endologix relies on *ResQNet.com*, in which the Federal Circuit found the plaintiff's expert relied on "radically different" license agreements as a starting point for the reasonable royalty analysis. *See ResQNet.com*, 594 F.3d at 869. Specifically, the expert there "used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels." *Id.* at 870. Endologix argues that Ms. Davis's "impropriety extends beyond that even contemplated by *ResQNet.com*. Ms. Davis does not even rely upon a license, but upon a 2010 ruling in an unrelated case." Dkt. 194 at 19. Endologix also relies, by way of supplemental authority, on *Laserdynamics, Inc. v. Quanta Computer, Inc.*, __ F.3d __, No. 06-CV-0348, 2010 WL 2012 3758093 (Fed. Cir. Aug. 30, 2012). In *Laserdynamics*, the Federal Circuit held that a settlement agreement for a royalty rate six times greater than the next higher amount paid for a license to the patent-in-suit was improperly admitted. *Id.* at * 21. The license was found to be unreliable because it was a result of last minute settlement prior to a trial at which the defendant would be subject to "a severe legal and procedural disadvantage." *Id.* Therefore, it was not an accurate portrayal of relevant licenses for consideration in *Laserdynamics*. Endologix argues this reasoning "applies even more so to the *Bard* ruling which was not a license negotiated by the parties, but rather was a compulsory license imposed by the Court on one party after having been found to have infringed at trial." Dkt. 301 at 3. Therefore, Endologix argues Ms. Davis's reliance on *Bard* improperly inflates the reasonably royalty rate and would be unhelpful and confusing to jurors.

Cook responds that Ms. Davis's reliance on the *Bard* opinion, as just one part of her analysis, was proper and does not render her opinion unreliable. Cook notes that Ms. Davis considered forty-five licenses, including the compulsory license in *Bard*, nineteen of which were between Cook and other inventors and had royalty rates of 0.5% to 3%. Yet, Cook explains, Ms. Davis also considered two licenses between Cook and a third party where the royalty rate was greater than 3%. Cook argues that Endologix's arguments go to the weight to be accorded to the *Bard* license, not its admissibility. Moreover, Cook argues there is little risk this testimony will mislead the jury because Ms. Davis's analysis is sound and reliably detailed. Cook concludes that any attack on Ms. Davis's testimony is properly presented during cross-examination at trial.

Cook also distinguishes Endologix's cases. First, it distinguishes *ResQNet.com* from this case, because there the licenses relied upon had no relation to the claimed invention. In this case however, the *Bard* compulsory license Ms. Davis took into consideration has a discernible link to the technology in the patents-in-suit. Second, Cook distinguishes *Laserdynamics* by focusing on the extreme nature of the license at issue. While there the excluded license had no real relevance to the patent-in-suit and was negotiated under pressure, the license in *Bard*, though compulsory, was thoughtfully applied after the district court considered the *Georgia-Pacific* factors and hypothetical negotiations.

### 3. Determination of Admissibility

The Court agrees with Cook that Ms. Davis's use of the *Bard* decision as a factor in her reasonable royalty analysis does not render her opinion unreliable and her testimony will not confuse or mislead the jury. While *Bard* was a compulsory license, the district court applied the *Georgia-Pacific* factors to reach an equitable result. *Bard* is not analogous to *Laserdynamics*, where the license was not an accurate reflection of reasonable negotiation. Moreover, the *Bard*

license is not "radically different" from the hypothetical licenses in this case and was not a "starting point" as in *ResQNet.com*. *See IP Innovation LLC v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Texas 2010) (excluding expert testimony in part because expert "arbitrarily picked a royalty rate that is much higher" than existing licenses by using an unrelated source as a "starting point"). Although *Bard* did not involve Cook or Endologix, it did involve a competitor and similar stent products. Furthermore, Ms. Davis's report thoroughly applies the *Georgia-Pacific* factors to reach her opinion on reasonable royalty. The Court finds no reason to exclude this one factor out of the many relied upon by Ms. Davis. As stated above, it is ultimately "up to the jury [ ] to weigh the credibility of the parties' opposing theories and evidence." *Ericsson, Inc.*, 352 F.3d at 1378.

## CONCLUSION

For the reasons stated above, Endologix's Motion to Exclude Opinion Testimony of Cook's Damages Expert Julie Davis, (Dkt. 193), regarding both lost profits and reasonable royalties is **DENIED.**

SO ORDERED:

Date: 09/10/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Bradley G. Lane
BRINKS HOFER GILSON & LIONE
blane@brinkshofer.com

Bryan John Leitenberger
BRINKS HOFER GILSON & LIONE
bleitenberger@brinkshofer.com

Danielle Anne Phillip
BRINKS HOFER GILSON & LIONE
dphillip@brinkshofer.com

Jason W. Schigelone
BRINKS HOFER GILSON & LIONE
jschigelone@brinkshofer.com

Kelly J. Eberspecher
BRINKS HOFER GILSON & LIONE
keberspecher@brinkshofer.com

Ralph J. Gabric
BRINKS HOFER GILSON & LIONE
rgabric@brinkshofer.com

Richard A. Kaplan
BRINKS HOFER GILSON & LIONE
rkaplan@usebrinks.com

Randy Lee Campbell, Jr.
BRINKS HOFER GILSON & LIONE
rcampbell@usebrinks.com

Andrew W. Hull
HOOVER HULL LLP
awhull@hooverhull.com

Daniel K. Burke
HOOVER HULL LLP
dburke@hooverhull.com

Alan L. Barry
K & L GATES LLP
alan.barry@klgates.com

Louis C. Cullman
K&L GATES LLP
1900 Main St., Suite 600
Irvine, CA 92614-0900

Sara N. Kerrane
K&L GATES LLP
1900 Main Street, Suite 600
Irvine, CA 92614-7319

Sanjay K. Murthy
K&L GATES, LLP
70 West Madison St., Suite 3100
Chicago, IL 60602

Joseph S. Cianfrani
KNOBBE MARTENS OLSON & BEAR, LLP
joseph.cianfrani@kmob.com

John David Evered
KNOBBE MARTENS OLSON & BEAR, LLP.
2jde@kmob.com

Joshua J. Stowell
KNOBBE MARTENS OLSON & BEAR, LLP.
2jys@kmob.com

John B. Sganga, Jr.
KNOBBE MARTENS OLSON & BEAR, LLP.
2jbs@kmob.com